## UNITED STATES *versus* JOHN P. SHELDON

March 5, 1829

340

William A. Fletcher, attorney general.
John P. Sheldon *in propria persona.*

## [OPINION OF JUDGE CHIPMAN]

I have bestowed the most earnest and unwearied consideration to the case now before the Court. The difficulty which it presented was not so much to learn what the law is—what the previous adjudications in like cases have been, as to inquire and be satisfied whether there was any thing in the case favorable to the defendant, which took it out of the general rule of law, or distinguished it materially, from the same class of adjudicated cases. The great quantity of irrelevant and declamatory matter which the defendant has thrown into his written argument, prevented my deriving much aid in the investigation from that source. I have endeavored, however, to separate those parts of the argument which are sound and pertinent, and founded upon legal authorities, from such as seem to be intended solely for the popular ear and for popular effect.

Of this class are the lessons which the defendant recited from various speeches and dissertations, upon the odious character of the sedition bill, the sophistry of Norman lawyers, the judicial ferocity of a Jeffries, and usurpations of the star chamber, which he applied to this court and the case before it, by way of argument, reproof or intimidation.

All this, and much more of the like kind have passed by me like the idle wind, and are forgotten in the necessary consideration of the important topics really connected with this case.

I hope there is nothing in the conscientious discharge of judicial duties, incompatible with an ardent attachment to the free institutions of one's country.

I trust, I love a manly, rational liberty as much as any man. But it is that liberty which the law freely gives, not that which is forcibly taken from it. That liberty which imparts equal rights, secured by just laws, administered without partiality, and without fear. That liberty which gives to the rich and the poor an equal, free and unobstructed access to the tribunals of justice, and to those tribunals the right of protection from unmerited insult, and lawless intrusion.

Upon these tribunals devolve the duty of redressing public and private wrongs, and protecting that liberty of the citizen which consists in the enjoyment of his legal rights.

Deeply impressed with the obligations and high responsibility which these duties impose on a judge, I proceed to declare the result of my examination into the law of the case presented for determination. In doing this, I can truly say in the language of Magna Charta, *nulli negabimus, aut differemus rectum vel justitiam.*

Three general questions are presented for the consideration of the court. The *first* regards the regularity of the proceeding; the *second* the jurisdiction of the court in the subject matter presented; and the *third*, the character of the publication, and whether it be a contempt, and if so, whether it has been purged by the defendant's answers to the interrogatories.

It is objected by the defendant, that the rule to shew cause was irregularly obtained, and that the attachment ought now to be discharged.

The most appropriate time for the defendant to have urged his objection was when he appeared to shew cause. Not having shewn this or any other cause, against the rule, it was made absolute. The court dispensed with issuing the attachment, and he was permitted to enter into his sole recognizance to appear and answer interrogatories.

If the preliminary objection as to the regularity of the proceeding had been made and sustained in the first instance, or if the defendant, upon appearing to the rule, had denied upon oath, the facts upon which it was founded, the rule would have been discharged in that stage of the proceeding. But in making the rule absolute, the court were willing that he should have the benefit of every kind of exception he might think proper to urge.

Without incumbering the question by the distinction between those cases of contempt where the proceeding is in the nature of a private remedy, and those where the contempt is against the court itself, and which the court may notice of their own knowledge, I shall proceed to inquire what the facts were, upon which the rule and attachment were founded, and the manner in which those facts were presented to the knowledge of the court.

It was known to the judges of this court, that in the case of the *United States against John Reed*, depending before them at the circuit, a motion was made by the defendant's counsel, for a continuance. Among the grounds urged in support of the motion, was the appearance of a publication in the *Detroit Gazette*, tending to prejudice the defendant's case, and interposing obstacles to a fair and impartial trial. The fact of the publication was supported by *affidavit*, and the paper containing the objectionable publication was produced and read. For this, and other causes shewn, the cause was continued, and is still depending.

Upon this affidavit and exhibit of the paper, a rule was awarded against Henry L. Ball, the publisher of that paper.

Subsequently to the issuing, and previous to the return of the rule, another publication appeared in the same paper, in which the defendant, Sheldon, avows himself to be the editor and conductor of the paper, and alone responsible for the article in question, which he republishes with further remarks, importing a defiance of the authority of the court, a contempt of the rule which had been granted, and that the proceedings of the court were founded in "ignorance and arrogance." He expressed a surprise that the judges should not have noticed an annunciation contained in a former number of his paper of his being the editor, and that the rule had not been taken out against him instead of Ball, the publisher.

The attorney general very properly conceived it to be his duty to notice this renewed and aggravated outrage against public justice. Consequently he, as the sworn officer of the government, filed of record a suggestion of the contempt, together with a copy of the offensive publication, and moved for a rule against the defendant, Sheldon.

I then thought, as I now think, that the rule was properly granted upon the shewing of the attorney general, and the facts already brought to the knowledge of the judges in the cases of Reed and Ball.

They had no alternative left, consistent with their oaths and their duty. The defendant had forced himself upon the notice of the court.

If they had shut their eyes to the publication, they could not close their ears to what was read and placed upon their files. They could not, if they had desired

it, remain ignorant that the defendant had claimed and publicly attempted to exercise a right to supervise and correct the decisions of the court—to interfere with and misrepresent its proceedings—to prejudice the rights of a party to a cause in court, and to vilify the judges in the performance of their official duties.

Upon the return of the rule against, Sheldon, and before it was made absolute, it was shewn further, by *Ball's affidavit*, that the defendant, Sheldon was the editor of the Detroit Gazette, in which the publication appeared, and that he was bound by contract, to publish whatever the defendant should direct to be published.

The conclusion, to my mind, is unavoidable, that the defendant ought not to be discharged from the attachment for the reasons assigned.

The next and principal question to be determined is, whether this court can take cognizance of the subject matter upon which the attachment is awarded—or in other words, is the publication complained of an offence which this court can notice in a summary way, as a contempt of its authority?

I will first examine the objection founded upon the constitutional right of trial by jury.

In doing so, I shall take it as granted, that wherever the constitution speaks of individual rights, it intends the rights of every citizen of the United States, which the state authorities cannot take away, and which belong to the individual as well in the territories as in the states. The case before the court does not nescessarily involve that question.

It is admitted that there is an offence against the court which the law calls a contempt, and which may be examined into by the court in a summary way, without the intervention of a grand or petit jury. But it is contended that this is a power which the court is only entitled to exercise as against its officers, or against another committing *disturbance* in its presence, and in a few other specified cases.

For example, against an attorney for extortion; against a sheriff for a false return, &c.; against a stranger for an assault in open court. Nor will it be denied, I presume, that a stranger may be proceeded against for a *rescous* in the same way. Although this is too limited a view of the power, as I shall shew from the books, it is conceding away the universality of the constitutional right of trial by jury. It is admitting that there are offences which may be proceeded against by attachment as contempts, and by indictment as crimes. Of this class is extortion by an attorney, and assault in *facia curiæ*.

It seems, then, that there are conceded cases in which the power of courts of justice in regard to contempts is not considered inconsistent with the right of the party to be tried by his peers.

But officers of court, as such, are not enumerated exceptions to this provision of the constitution. Persons employed in the naval and military service of the United States, only are excepted. The exceptions, then, are to be sought for elsewhere than in the constitution, and they are only to be found in the distinction of the common law between those acts denominated *crimes* and those denominated *contempts*. And this distinction is not referable to the *person* who may commit, but to the character of the *offence* which is committed.

Contempts against courts of justice, are not included in the legal definition of crimes and misdemeanors, but are considered as offences *against the court itself*, which they by the common law are authorised to punish in a summary way, by attachment.

This power in courts is essential to the exercise of their functions. It is in vain to say that a partial or merely consequential and indirect obstruction to the exer-

cise of their duties is not a contempt. Courts must have the power to coerce a full and entire obedience or removal of impediments, or the laws would be partially and imperfectly administered. This removal of impediments cannot be delayed, otherwise the operation of the laws would be suspended. Juries cannot remove the impediment, though they might punish the act, if a criminal one, which occasioned it.

There are certain cases, in which an individual is permitted by the law to vindicate his own rights and redress the injuries he may sustain. The right is founded in the exigencies of natural law, which the laws of society cannot supply. Of this nature is the right of self defence, of recaption and reprisal, of entry on lands, distraining cattle damage feasant, and of abating nuisances.

This is properly the law of necessity. But it is not that law of necessity which can be denominated the law of tyrants, because it is made a part of the common law, which prescribes the extent and manner of its exercise. The use of these modes of redress, has never been considered violations of the common law right of trial by jury.

Resting upon the same basis as the right of self defence, or abating a nuisance, is the power of courts to protect themselves in the exercise of their duties, and to remove obstructions to the performance of them.

Hence it is that in the case of *Anderson & Dunn*, in the supreme court of the United States, the power to punish contempts is referred to the natural law of self defence.

The right of trial by jury existed before the adoption of the constitution, and is engrafted upon it. It creates no new right, but is declaratory of that which existed before, and secures that invaluable institution of the common law, from violation or encroachment.

This construction has been given, repeatedly, practically, and expressly by judicial opinions, and by legislative construction.

It is in conformity with this construction, that chancery and admiralty powers are conferred, and courts for the probate of wills and the settlement of estates are established.

But it has never yet been held that the jurisdiction of these courts was in violation of the constitutional right of trial by jury.

This construction is confirmed by the decision of the supreme court of the United States in the case of *Anderson & Dunn*, and by numerous cases of proceedings for contempt in the United States, and state courts.

Both houses of congress, and different state legislatures, have sanctioned this construction, and have vindicated their rights of self protection, by punishing for contempts. Not their members and officers only, not merely for a disobedience of their rules or disturbance in the face of the legislature, but for acts done beyond their walls.

Congress have further sanctioned this construction, by confirming to the United States' courts by law, the right to punish contempts by fine and imprisonment. A similar law exists in this territory, and different states legislatures have passed laws confirming, defining or restricting this right. These acts of legislation could not have been deemed by their authors to conflict with the constitutional rights of the citizen.

I cannot perceive any new light thrown upon this part of the constitution in the argument of this case, which would induce me to depart from the construction given to the constitution by the universal concurrence of the highest authorities in the nation.

If we look to the ordinance of congress, which is the organic law of this territory, we find the title to the "trial by jury," accompanied by the guarantee of "judicial proceedings according to the course of the common law."

The same instrument provides that "no man shall be deprived of his liberty or property, but by the judgment of his peers, or *the law of the land*.

It has been judicially decided that by "the law of the land," is intended the *lex terra*, or the common law.

It is a necessary deduction from the words of the ordinance, that in this territory the right of trial by jury is co-extensive with the right as it exists at common law, and that it leaves unrepealed and unimpaired the power which, by the common law, is deposited in the courts of justice, to proceed by attachment against those who disobey the lawful process and orders of the courts, or who directly, or consequentially obstruct the free and impartial administration of justice.

Another ground of objection to the jurisdiction of this court is, that the proceeding is an infringement of the liberty of the press. It is obvious that if, by the liberty of the press is meant freedom from legal restraint, the objection will apply as well to proceedings by jury as by attachment.

I consider the liberty of the press of too great value to be slightly regarded or wrongfully invaded. But respect for this liberty ought not to be carried so far as to secure to a publisher an entire impunity from the operation of the law. It cannot confer on him the right to do wrong. It cannot place him above the reach of the law. It does not make him a privileged being, to disregard all rights but his own.

That great and universal rule of equity and law, *sic tuum utere ut alienum non laedere* (so use your own as not to injure the rights of others) is as justly binding upon the publisher of a newspaper as upon any other member of society.

If I were to choose a definition of the liberty of the press most consonant with the character of a republican government, I should be disposed to adopt that which was made by *Alexander Hamilton* in *Croswell's* case, 3 John. It is that "the liberty of the press consists in the right of publishing the truth from good motives and for a justifiable end." This definition leaves it with all its usefulness and subject to no other restraint than the good of society and the rights of its members require.

If a printer publish what is false or malicious, or of unlawful tendency, he should be made amenable to the laws for the private or public injury. Such action or indictment could not be held to be an infringement of the true liberty of the press.

The constitution of the United States places the freedom of speech and of the press upon the same footing. Congress is prohibited from passing any law abridging either. But it has never been dreamed that this inhibition can take away the common law action for slanderous words, any more than it can alter the law of libels for a printed slander. Even the law makes this distinction, (although the constitution places the liberty of speech and of the press upon the same footing,) that words are only actionable which falsely impute a criminal act, or are attended with special damage: Whereas to hold up a man to public ridicule or contempt, in print, is held to be libellous, tho' no crime is imputed and no damage is proved.

The constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor. No rights are intended to be granted by the constitution for an unlawful or unjustifiable purpose. And although that instrument prohibits the passing of any law abridging the liberty of the press, it does not follow, that if the act of which this defendant is charged is a contempt

of the authority of the court, that it is any the less a contempt because it is committed through the medium of the press. It remains to inquire whether the publication in question is by the law of the land, included in that class of offences denominated a contempt. This question, like every other presented to a court for adjudication, must be determined by precedent and authority. And these I take to be as many, as direct, as well defined, and as strongly cemented by judicial decisions in this country and in England, as can be found to apply to any one branch or proposition of the law.

Judge *Blackstone*, 4 Com. 283, distinguishes *contempts* as being either *direct*, which openly insult or resist the powers of the court, or the power of the judges who preside there; or else as *consequential*, which, (without such gross insolence or direct opposition,) plainly tend to create an universal disregard to their authority. He says, "some of these contempts may arise in the face of the court; as by rude and contumelious behaviour, or by obstinacy, perseverance and prevarication; by breach of the peace, or any wilful disturbance whatever: others, in the *absence* of the party; as *treating with disrespect the writs, rules, or process of the court;* by perverting such writ or process to the purposes of private malice, extortion, or injustice; by speaking or *writing contemptuously of the court, or judges acting in their judicial capacity;* by printing false accounts, (or even true ones, without proper permission, of causes *then depending in judgment;* and any thing in short, that demonstrates a gross want of that regard and respect, which when once courts of justice are deprived of, their authority is entirely lost," &c. "The process of attachment for these and the like contempts, must necessarily, be as antient as the laws themselves; *for laws without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory."*

*Hawkins*, in his pleas of the crown, 2 vol. 228, distinguishes the different kinds of contempts under the following heads. 1. Contempts of the king's writ. 2. Contempts in the face of the court. 3. *Contemptuous words or writing concerning the court.* 4. Contempts of the rules or awards of the court. 5. Abuses of the process of the court. 6. Forgeries of writs and other deceits of the like kind, tending to impose on the court.

All the English elementary writers, who treat of the law of contempts, agree essentially with Hawkins and Blackstone, that a contempt of Court may be committed by words or writing. They also agree that the process by attachment is as old as the law itself, and that it was confirmed by *Magna Charta*, among the rights extorted from the English monarchs as an essential security to courts of justice, in the administration of the law.

To ascribe the origin of this mode of proceding to the court of star chamber, is without the least foundution in truth, and I find mention of only one case of that kind (*Chambers* case in Co. Car.) in that court.

Chief Justice *Holt* (1 Ld Raym. 148) declared that the publication of a paper tending to prejudice the public mind in regard to a cause depending, was a great crime.

In the case of *Burdett* vs *Colman*, (14 East. 163) Lord Erskine says, "The House of Commons, whether a court or not, must like every other tribunal, have the power to protect itself from obstruction and insult, and to maintain its dignity and character. If the dignity of the law is not sustained, its sun is set, never to be lighted up again." And he says that while he presided in the court of chancery, he committed a person for contempt for sending the chancellor a pamphlet, the object of which was by partial representation, and by flattering the judge, to pro-

cure a different species of judgment from that which would be administered in the ordinary course of justice.

I will notice only one English case particularly illustrative of the law relating to this class of contempts. The case is in 2 Atk. 471, and was decided by Lord Hardwick, to whose honor it is said, that during the twenty years he sat on the chancery bench, not one of his decrees were reversed. The Lord Cancellor there decided, that a publication in a public newspaper, reflecting upon a party to a suit depending, and prejudicing the public mind against him, before the cause was heard, was a contempt of court: that though the libel might be prosecuted by action or indictment at law, it might also be punished as a contempt: and that the publisher was equally liable with the writer.

I will now proceed to notice some of the American cases, relating to the doctrine of contempts.

The case of *Anderson vs. Dunn*, (6 Wheat. 204) was decided in the supreme court of the United States. Anderson was attached and punished by the House of Representatives of the United States, on a charge of a breach of the privileges of said house, and of a high contempt of its dignity and authority.

An action was brought in the circuit court for the District of Columbia, in the name of Anderson against Dunn, the sergeant at arms of the House of Representatives. The defendent pleaded the general issue, and a special plea in justification. The plaintiff demurred generally to the special plea, which was adjudged good, and the demurrer overruled.

Upon this, a writ of error was brought to the supreme court of the United States.

It was contended by the counsel for the plaintiff in error, among other things, that the common law power to punish for contempts, was only incidental to courts, and not to congress, or the "House of Representatives," being terms unknown to the common law.

It was contended for the defendant that the necessity of self defence is as incidental to legislative, to a certain extent, as to judicial authority. That this power is not so much a substantive provision of the common law, but rather a principle of universal law, growing out of the natural right of self defence belonging to all persons.

The judgment below was affirmed. Judge Johnson delivered the opinion of the court, which contains a most lucid and masterly exposition of the principles upon which the law of contempts is founded.

The amount of the decision by these great expounders of national and constitutional law, is, that the power to punish for contempts *is incident to and inseparable from the grant of judicial powers;* that the exercise of the power does not violate any constitutional right; and that the law of congress declaring that the United States' courts may punish contempts by fine and imprisonment, is only declaratory of a prior right, incident to the creation of the courts themselves.

In the case of *Hollingsworth* vs *Duane*, and *The United States* vs *the same*, (Wallace's Rep. 80    105 & 6) was decided in the circuit court of the United States, for the district of Pennsylvania.*

The contempt alleged to have been committed, was a publication in a newspaper, containing aspersions upon the judges, jurors and witnesses. It was adjudged to be a contempt, and the defendant was sentenced to thirty days' imprisonment.

The state and territorial courts have all exercised jurisdiction in regard to contempts. Some of the cases are reported, but the greater number are not. In Louisiana, for a period before it became a state government, and when its population was

composed of restless and discordant materials, the printers at New-Orleans conceived it to be their duty to intermeddle with the proceedings of the courts, and took upon themselves appellate and conclusive jurisdiction in causes pending, even before the courts had decided them. This proceeding was arrested by one of the courts, who thought it to be its duty by attachment to vindicate the right and necessity of courts being left to transact their business without molestation or prejudice. From that day to the present, the newspapers in that as in the older states, have ceased to publish matters tending to prejudice the public mind in regard to subjects in litigation, or to exercise a pretended right to influence the proceedings of courts of justice.

A similar case took place in Missouri, not many years after the admission of that state into the union. It was the publication of a partial and unfair report of a case decided, furnished by one of the lawyers in the case, for the purpose of prejudicing the public mind against the judges who decided. The consequence was, the punishment of the lawyer and publisher for the contempt.

The case of Baptist Irvine, the editor of a newspaper in Baltimore, and a much more recent one in Florida, are of the same character.

In order to shew what the law is, in the older states of the union, I will examine the decisions in Pennsylvania and New-York, the report of the decisions of those states being more accessible.

The case of *Oswald*, (6 *Dal. Rep.* 319.) decided in the supreme court of Pennsylvania, will be best understood from the opinion of the court delivered by *chief justice M'Kean*.

He said "This is a motion for an attachment against *Eleazer Oswald*, the printer and publisher of the Independent Gazetteer of the 1st of July last, No. 796. As a ground for granting the attachment, it is proved that an action for a libel had been instituted in this court in which *Andrew Browne* is the plaintiff, and *Eleazer Oswald* the defendant; that a question respecting bail in that action had been agitated before one of the judges from whose order discharging the defendant on common bail, the plaintiff had appealed to the court; and that Mr. *Oswald's* address to the public, which is the immediate subject of complaint, relates to the action immediately depending before us."

"The counsel in support of the motion have argued that this address was intended to prejudice the public mind upon the merits of the cause, by propagating an opinion that *Browne* was the instrument of a party to persecute and destroy the defendant; that he acted under the particular influence of Dr. Rush, whose brother is a judge of this court; and in short, from the ancient prejudices of all the judges, the defendant did not stand a chance of a fair trial."

"Assertions and imputations of this kind are certainly calculated to defeat and discredit the administration of justice. Let us therefore inquire *first* whether they ought to be considered as a contempt of the court; and *secondly*, whether, if so, the offender is punishable by attachment."

"And here I must be permitted to observe, that libelling is a great crime, whatever sentiments may be entertained by those who live by it. With respect to the mind of a libeller, it is more dark and base than that of the assassin, or than his who commits a midnight arson. It is true, I may never discover the wretch who has burned my house or set fire to my barn; but those losses are easily repaired, and bring with them no portion of ignominy and reproach. But injuries which are done to character and reputation, seldom can be cured, and the most innocent man may in a moment be deprived of his good name, upon which, perhaps, he depends

for all the prosperity and all the happiness of his life. To what tribunal will he then resort? How shall he be tried, and by whom shall he be acquitted? It is in vain to object that those who know him will disregard the slander, since the wide circulation of public prints, must render it impracticable to apply the antidote as far as the poison has been extended. Nor shall it be said, that the same opportunity is given to *vindicate*, which has been employed to *defame* him; for many will read the charge who may never see the answer; and while the object of accusation is publicly pointed at, the malicious and malignant author, rests in the dishonorable security of an anonomous signature. Where much has been said, something will be believed; and it is one of the many artifices of the libeller, to give his charges an aspect of general support, by changing and multiplying the style and name of his performances. But shall such things be transacted with impunity, in a free country, and among an enlightened people? Let every honest man make this appeal to his heart and understanding, and the answer must be—no!"

The learned judge then goes on to shew that the *bill of rights*, and the *constitution of Pennsylvania*, by declaring "that the freedom of the press shall not be restrained," only intended to preclude any attempt to fetter the press by the institution of a *licenser*.

"If then," says the same judge, "the liberty of the press is regulated by any just principle, there can be little doubt that he who attempts to raise a prejudice against his antagonist, in the minds of those who must ultimately determine the dispute between them, willfully seeks to corrupt the source and dishonor the administration of justice."

"Such is evidently the object and tendency of Mr. *Oswald's* address to the public. Nor can that artifice prevail, which insinuates that the decision of this court will be the effect of personal resentment; for if it could, every man might evade the punishment due to his offences, by first pouring a torrent of abuse upon his judges, and then asserting that they act from passion, because their treatment has been such as would naturally excite resentment in the human disposition. But it must be remembered, that judges discharge their functions under the solemn obligations of an oath; and if their virtue entitle them to their station, they can neither be corrupted by favour to swerve from, nor influenced by fear to desert their duty. That judge, indeed, who courts popularity by unworthy means, while he weakens his pretensions, diminishes likewise the chance of attaining his object; and he will eventually find, that he has sacrificed the substantial blessing of a good conscience, in an idle and visionary pursuit."

"Upon the whole, we consider the publication in question as having the tendency which has been ascribed to it, that of prejudicing the public, (a part of whom must hereafter be summonded as jurors) with respect to the merits of a cause depending in that court, and of corrupting the administration of justice: We are therefore *unanimously* of opinion, on the *first* point, that it amounts to a contempt."

The learned judge proceeds to shew that the proceeding by *attachment* is not a violation of the constitutional right of a trial by jury. And in passing the sentence of the court, he says, "not only my bretheren and myself, but likewise all the judges of England, think, that without this power, no court could possibly exist; nay, that no *contempt* could indeed be committed against us, we should be so truly *contemptible*."

The defendant was sentenced to pay £10, and be imprisoned for one month.

In 1802, *Thomas Passmore* was sentenced and imprisoned by the supreme court of Pennsylvania, for a contempt of court. The alleged contempt consisted in his

posting up in a coffee house in Philadelphia, a libel against *Petit and Bayard*, relating to a suit then pending between them and Passmore.

This case called forth all the heat engendered by the party feelings of the day. The question as to the powers of the court in regard to contempts, was more fully discussed than in any case of the kind which has been presented. The conduct of the judges was censured, and the judges were tried on articles of impeachment preferred against them. They were acquitted of the charges, but under circumstances which afford no authority either for or against the doctrine contended for on our side, and opposed on the other. But the concessions made by the party most strenuously opposed to the proceedings of the court, shew the extent to which they considered the doctrine to be undisputed.

The committee who reported the articles of impeachment, concede that every court of justice necessarily possess the power to punish for contempts in certain cases; yet they are of opinion that offences, such as are charged against the said Thomas Passmore, if viewed *under all the variety of circumstances connected with the case*, do not amount to a contempt of court."

"1. Because the publication *did not reflect on the judges* in their *judicial* capacity, nor *personal* character."

"2. Because there there was no direct allusion in the paper called a libel, to *any cause pending* before the court."

"3. Because it appears from the record, that the said Thomas Passmore was warranted in the conclusion that the suit between him and Petit and Bayard *was then ended.*"

This case then affords judicial and legislative decisions, as to cases which may constitute a contempt of court.

The adjudicated cases in the state of New-York, go fully to establish the position, that the publication by a printer, reflecting upon the judges in their judicial capacity, or upon a party to a cause, in regard to a suit depending, is a contempt of court.

The first case reported, is that of *the People* vs. *Freer*, (1 *Caines Rep.* 485 and 518. It was an attachment for contempt, for publishing in the *Ulster Gazette*, paragraphs containing remarks on the trial of *Harry Crosswell.*

*Hamilton* was counsel for the defendant, and entered zealously into the cause; but that great lawyer did not take the exceptions to the jurisdiction, made in the case now before this court.

*Kent*, justice, delivered the opinion of *the court*, and laid down the position as the settled law, that "publications scandalizing the court, or intending unduly to influence or overawe their deliberations, are contempts, which they are authorized to punish by attachment." And this eminent jurist adds "a trust that the notice taken of that case would answer all the ends of justice, by serving as sufficient warning to the defendant and others, not to presume to use language which must be understood as reflecting upon or threatening the court, in respect to questions then under investigation."

In the case of *the People* vs. *Few, Van Wyck and Townsend*, 2 *John. Rep.* 290, the contempt alleged was a publication, in a newspaper, of certain resolutions of a public meeting, holding up to public odium and reprehension, *Morgan Lewis*, (then a candidate for governor,) for having commenced an action for a libel against one *Farmar.*

The action was pending and at issue. *Sandford, Riker and Thomas Addis Emmet*, were counsel for the defendant. The power of a court to punish as a contempt,

publications prejudicing the public mind against a party to a cause pending, was not denied by the learned counsel. On the contrary, they contented themselves with negativing any intentional disrespect to, or contempt of the court, or any intention to influence or effect the course of justice, in the decision of the cause, and declared that the only intention and object of the resolutions was to influence the election of a governor.

The judges, *Kent, Livingston, Thompson, Spencer and Van Ness,* (among whom there appears to have been no difference of opinion, that the publication under ordinary circumstances would have been a contempt,) discharged the attachment, undoubtedly upon the ground that it would be *inexpedient* to interfere with the freedom of discussion in regard to a popular election.

This case cannot be considered in the least as shaking the decision in *Freer's* case: on the contrary it confirms it.

The defendant has referred to the case of *J. V. N. Yates,* in 6 *John.* as furnishing opinions in support of his objections. As the decision in that case was subsequently overruled in the same court, I have taken pains to examine that, as well as the whole series of cases arising from the same subject matter.

J. V. N. Yates, being a master in chancery, filed a bill in behalf of one *Samuel Bacon,* and subscribed to it the name of *Peter W. Yates,* a solicitor in chancery, without the knowledge or consent of the solicitor whose name he had used.

Upon complaint, and these facts being made to appear, he was attached and imprisoned by chancellor *Lansing,* for "malpractice and contempt," which in the order of conviction, and in the attachment, is said to be "contrary *to the statute* in such case made and provided, and in wilful violation of his duty as master, and in contempt of the authority of the court."

By a statute of that state, a master in chancery is prohibited from acting as a solicitor.

Yates was afterwards brought before Mr. *Justice Spencer,* upon *habeas corpus,* and discharged. The judge considering it as an offence against the *statute,* and therefore punishable by indictment only.

The delinquent was re-committed by the *chancellor,* and a second time discharged by judge *Spencer,* and again recommitted by the *chancellor.*

Yates was then brought before the supreme court by *habeas corpus,* and upon argument and full consideration was *remanded* to prison. The court fully recognizing the legality of the commitment by the chancellor.

This decision was subsequently reversed upon writ of error. These two cases are reported in 4 *and* 6 *John. Rep.*

A suit was commenced by *Yates* against *Lansing,* the chancellor, for $1,250, the penalty of the *habeas corpus* act. The penalty was claimed on the ground of the re-commitment of Yates, after his discharge under that act.

The judgment of the supreme court, was in favor of the defendant, Lansing. And this judgment was subsequently affirmed by the high court of errors.

These two cases are reported in the 5 *and* 6 *John. Rep.*

The first of these cases is that of J. V. N. Yates, 4 *John. Rep.* 317. This was heard upon a motion by Yates to be discharged under the writ of *habeas corpus,* returned to that court.

The grounds taken by Emmet in support of the motion, were

1. That the commitment was by order, and not by writ.

2. That the recommitment of the defendant, after his discharge under the *habeas corpus* act, was a violation of that act.

3. The generality of the terms of commitment.

4. That the matter charged against the prisoner, was an indictable offence, and could not be punished by attachment for contempt.

5. That the conviction was founded upon insufficient evidence, not being derived from the answers of the prisoner to interrogatories.

6. That the imprisonment was for an indefinite time.

The court over-ruled the motion, and the prisoner was remanded to prison. *Kent, Thompson and Van Ness* concurring.

*Chief Justice Kent* delivered the opinion of the majority of the court, and fully maintained the legality and necessity of the power in courts to punish for contempts. He said "the judicial is, from its very constitution, the feeblest department in government. It is so checked and so controlled, that it cannot essentially abuse its powers. The case of an abuse of that power is probably not to be found in modern times. An alarm cannot be excited at its existence, in the extent now laid down. It is given to courts for their preservation, in order to enable them *to repel insults, to protect suitors, to support their process,* and to be an asylum from violence and oppression."

Judge Spencer, who dissented, did not found his opinion in opposition to the general doctrine of contempts, as laid down by judge Kent. He admits that the party might undoubtedly have been proceeded against in this way, for that part of the offence not punishable by statute, *"if that part had been proceeded upon separately."*

Judge Yates, who also dissented from the opinion of the majority of the court, declared it as the basis of his opinion that "all courts have a right to punish for *contempts,* but all courts have not the right to punish for *crimes.*

It is thus seen, that in this case no one member of the supreme court advanced an opinion adverse to the decision in the case of Freer.

This decision was afterwards carried up to the court for the trial of impeachments and correction of errors, and is the same case referred to by the defendant, in 6 *John. Rep.* 337.

It was argued here, upon the grounds already noticed, taken by Mr. Emmet before the supreme court.

The decision of that court was reversed by the court of errors, contrary to the opinion of the chancellor, and three of the five judges.

The effect of that reversal, for the time, was to establish, among other positions,

1. That where an act is *indictable,* as being done in violation of a statute, it cannot be punished as a contempt.

2. That the chancelor could not imprison, for a contempt, for an indefinite period.

3. That a person discharged by a judge in vacation, on *habeas corpus,* cannot be re-committed for the same offence.

*Clinton,* senator, contended that a contrary doctrine was pregnant with danger to the rights of the citizen, and if sanctioned, would lead to judicial tyranny. He believed the case under adjudication, was one in which the chancellor, in regard to the points of objection, assumed an unauthorised power. It is true undeniably, that any exercise of power by a public officer or private individual, not delegated or sanctioned by law, is so far a dangerous tyranny and usurpation. But it would be a libel upon the character of this great man, to apply his remarks to the exercise of a lawful and legitimate authority.

And indeed, to apply his opinion beyond the reason, and the matter which called it forth, is to convert it into idle declamation, and unmeaning generality.

In the decision of this case, nothing is found to impinge upon the law recognized in *Freer's* case, as to what shall constitute a contempt.

The next case is *Yates against Lansing*, 5 *John. Rep.* 282. This was an action for the penalty of the *habeas corpus* act, for an alleged violation of that act by the defendant, for recommitting the plaintiff, after he had been discharged by Judge *Spencer*. Upon demurrer, there was a judgment for the defendant.

From this decision, the cause came before the court for the trial of impeachment, and correction of errors, 9 *John.Rep.* 394. All the points which had been argued and decided in the previous case of *Yates against the People*, in the same court, were reviewed, and the whole of the former decision overturned; although the counsel for *Yates* contended for, and *Clinton*, senator, supported the doctrine of *stare decicis et non quieta movere*.

The whole of the case, however was reconsidered. Blackstone, Hawkins, and other English elementary writers, were referred to as containing the doctrine of contempt, upon which the court were to decide. *Platt*, senator, is the only one whose opinion is reported, and may be taken as furnishing the reasons of the decision.

He said, "the right of punishing for contempts by summary conviction, is inherent in all courts of justice, and legislative assemblies, and is essential for their protection and existence; it is a branch of the common law, adopted and sanctioned by our state constitution. The discretion involved in this power, is in a great measure arbitrary and undefinable; and yet the experience of ages has demonstrated that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice."

"The known existence of such a power prevents in a thousand instances, the necessity of exerting it; and its obvious liability to abuse, is a strong reason why it is so seldom abused."

"This power extends not only to acts which directly and openly insult or resist the powers of the court, or the persons of the judges, but to *consequential, indirect and constructive contempts*, which obstruct the process, degrade the authority, or contaminate the purity of the court."

"The *officers* of the court, are peculiarly subject to its discretionary powers, and may be punished in this summary manner for oppression, extortion or abuse in their official capacity."

"A contempt is an offence *against the court* as an organ of public justice; and the court can rightfully punish it, on a summary conviction, whether the same act be punishable as a crime or misdemeanor on indictment or not.

"To challenge a senator or judge, may under circumstances, be a contempt; but it is certainly indictable. A conviction on indictment will not purge the contempt; nor will a conviction for a contempt be a bar to an indictment.— The offence may be *double*, and so are the remedy and the punishment. For instance, *assaults* in the presence of the court, *rescous*, extortion, libels upon the court or its suitors, relating to suits pending, forging a writ, &c. are *indictable* offences; and certainly they are also *contempts*."

This quotation serves to shew the views taken in the case of *Yates vs. Lansing*, in the highest judicial tribunal in the state of New-York, in regard to the law of contempts. It is indeed a most fearful power, to the extent thus laid down, and one which a court should approach with caution, and use with moderation; one in which all personal considerations must be merged in the highor sense of imperative duty.

*Clinton*, senator, said "the patience of the court was yielded without reluctance

to a protracted discussion, which terminated in establishing what was never questioned: that the court of chancery, as well as every other court, has a right to punish contempts, and to apply the rod of chastisement to the conduct of its officers; but that chancery had a right to punish for *crimes*, he considered as not established."

The concession here made by Clinton, goes to the extent of the case before the court, which was that of an officer of the court of chancery, and it cannot be logically inferred, that he intended to be understood as confining the right to punish for contempt to an officer of the court only; and he elsewhere admits the right to punish for a contempt in *facie curiæ*. The power he denies is, that of punishing as a contempt, that which the statute had made a crime. So far, then, as the opinion was governed by the case, no authority can be drawn from it, limiting this power to the case of an officer only.

Whatever weight we may be disposed to give to a great name, no authority can be derived from an opinion which was overruled, as it appears, by a majority of nearly two-thirds of the attending members of the court.

I have dwelt thus long upon these cases, not because the decisions of the courts of New-York are binding, as such, upon this court; but because the defendant imputed to the cases referred to by him in the 6th John. a bearing totally different from that which the cases taken together will justify.

I was surprised at the boldness of the assertion that the doctrine of contempts had not been generally adopted in this country. That there were no American cases. That the proceeding was repugnant to the genius of a republican government, and is only necessary in despotic governments, where right is extorted by power, and power maintained by force.

The contrary of all this is true. The decisions in the national and state courts have been uniform in support of the power, and in acknowledging its necessity and its lawfulness. It has been adopted and acted upon by the organs of the national government. It has been incorporated with the laws of every state of the union, and of the territories, and exercised in numerous instances, and in every form which the occasion has called for.

It has been exerted for the preservation of decorum, to enforce obedience to the process of courts, to punish officers for the violations of duty, to protect parties, witnesses, jurors and judges from insult, from within and without the walls of a court. And it has certainly, and in many instances, been used to vindicate the right of American citizens, to an administration of the laws, free from the control or misrepresentations of the press.

In a republican government, where laws and not men govern the rights of the people, there is a peculiar propriety in punishing those who obstruct the administration of those laws. And when I perceive that so many American judges and legislators have sanctioned the use of the power, I do not feel myself at liberty to depart from the opinion, that it is a necessary, wise, and salutary power.

I now come to the consideration of the *third* and last ground of enquiry as to *the character of the publication, and whether if it be a contempt, it has been purged or excused by the defendants answers to the interrogatories.*

Having in a consultation with my brethren, ascertained their views upon this head, and being advised that judge Woodbridge intends to embrace in his opinion a particular examination of the character and tendency of the offensive publication, I have thought it unnecessary to go over all the reasoning by which I have arrived at the same conclusions.

The piece headed "Progress of the perfection of reason in Michigan," is upon the face of it an open, undisguised and disingenuous attack upon the official character of the judges of this court.

That it was so intended, no one who reads it can doubt. The introductory remarks are of the same rude and disgusting complexion, and carry with them a direct insult and defiance of the authority of the court, and a contempt of its process and proceedings in the case of Ball. The report of the case of Reed, if such a partial and discoloured representation can be called a report, is imperfect, unfair and untrue. It does not give a view of the whole case—of the different points made by Reed's counsel, all of which may fairly be presumed, more or less to have influenced the determination of the court. Upon the main point upon which the opinion of the court turned, the principal reasons assigned by the court are suppressed, and what is given as the language of the majority of the court is, in part, language not used at all, or identical words separated from their connection and perverted from their meaning and application.

There is enough in the published accounts to preserve the semblance of identity, and enough of suppression and unfairness to give it the essential character of falsehood and misrepresentation.

It is precisely the kind of production fitted for the purposes of the defendant; and for such purposes it was undoubtedly prepared and used.

If the publication had contained nothing more than its low bred and illiberal reflections upon the judges, I think I can safely say, that it would not have been read by them, or if read, passed over in silent contempt. But the publication related to a cause pending before the same judges. The defendant knew that it was so pending. His own publication confesses it.

The party who felt his rights to be affected by the publication, brought it to the notice of the judges. He made affidavit of the publication, and of the paper in which it appeared. It was filed in the cause, and its foul aspersions read to the judges on the bench, in the hearing of the bar and of the spectators.

In effect, the contempt was as flagrant as if the author had posted the production on the walls of the court chamber, or proclaimed it aloud in the face of the court.

I do not look to the injury which the party in the cause was exposed to, from the unfair report of his case, alone, but to the injurious consequence of the *whole* publication.

It is not necessary to establish the precise degree of injury which ensued, or was likely to follow. That would depend upon the number of readers and the credit and consequence which each might be disposed to attach to it. If it did not produce the greatest degree of injury to the party, it was not because the publication had not that tendency. It was an endeavor to fix a belief on the minds of the community, from which the future jurors were to be drawn, that the accused had been rightfully and legally convicted; that the court had mistaken the law and the justice of the case.

Would it not have been a mere mockery to empannel twelve men for the future trial of that case, into whose minds the defendant has infused a belief that the court had erred, and that their opinions were not to be regarded?

The real object of the defendant undoubtedly was, to prejudice the public mind against the judges.

The dearest rights of a party in court was lost sight of by the defendant, in his eager pursuit of an object so interwoven with the mischievous purposes of his heart.

But the judges, who are thus assailed for their opinion, were again to sit upon the trial of the accused. Is it consistent with the independent discharge of their duty, that *they* should be thus rudely and unjustly arraigned?

Not one of the cases referred to, exhibit such a high handed and aggravated attempt to interfere with the administration of justice, as this case, in all its aspects, presents.

I should have been happy to have discovered in the defendant's answers to the interrogatories, matter of justification or excuse—some relenting from an unlawful purpose—some atonement to insulted justice. Nothing of this kind appears.

He admits the publication, and justifies the act, on the ground that he *believed* it to be true, and containing a true statement of the *decision* of the court, and that it was his right and duty, as an editor, so to publish. He says he did not know, nor does he believe, that the publication is a contempt of the *authority* of the court. That he did not intend, nor does he believe, that the publication did injure the rights of a suitor, or in any manner prevent the due administration of justice.

It is too obvious to require comment, that the answers do nothing more than put in issue the character and effect of the publication, and do not afford any new fact in justification or extenuation.

In his answer and in his argument to the court, in justification, he asserts it as his right and duty to publish whatever he pleases, concerning the business and proceedings of the court, so long as *he believes* the publication to be true. And he speaks with much complacency of having *"scourged"* one set of judges out of office, and most of them out of the territory.

If the publication exhibited in this cause is of the kind which he claims it as his right and duty to publish, and his object the same as he avows to have been his object heretofore, he has certainly brought the matter to this issue, that he must be made to bend to the law, or the law must bend to him.

The tribunals entrusted with the administration of justice, must be permitted to perform their appointed duties, without "let, hindrance or molestation," or else they must surrender their powers to the dictation and controul of this defendant, and bow in silence to his self-sufficient, self-assumed, and irresponsible authority. The *contestatio litis* must be transferred to a newspaper forum, where facts are suppressed or misrepresented, public opinion forestalled and abused, courts insulted and overawed, and the decisions of life, liberty, property and reputation, made to depend upon the excited passions and enlisted prejudices of the community.

It is this extravagant and mischievous pretension, claimed as a *right*, and attempted to be carried into effect, that this court are now called upon to punish and suppress.

Before the right can be admitted, the power to exercise it must have been rightfully and lawfully delegated; and it was incumbent on the defendant to have shewn whence he derived a power above the laws, and inconsistent with their freee and unobstructed dispensation.

The assumption of a right, striking at the foundations of civil society, and which at the arbitrary will of an individual would resolve the powers of government into their original elements, cannot be recognized by this, or any other court. Such a recognition would be destructive, alike, to private rights and to public liberty: and they who set themselves up in opposition to the regular operation of the laws, will be found to be acting under the delusions of interest, hatred, party feeling, or some other more unworthy motive, and not from a sense of public duty, or regard for the public good.

The act by which the defendant has brought himself into a conflict with the authority of the court, is voluntary, deliberate and premeditated.

The law is plain, incontestible and of undoubted authority.

The contempt is intentional, aggravated, unatoned, and strikes at the independence of the court, and the rights of every citizen who applies to it for protection or redress.

The duty imposed upon the court is to declare the conclusions of the law.

I have no reasonable doubts as to what those conclusions are, and no hesitation or fear in discharging my duty.

### [OPINION OF JUDGE WOODBRIDGE]

Having been favoured, at the conference which the Judges had yesterday, with the general views, which each of them proposed to take of this case, in expressing his opinion here:— & especially having been indulged with the reading of a part of the written opinion of Judge Chipman, I have deemed it proper, for myself, to touch but lightly, or not at all, upon many points, which I should, otherwise have gone more fully into:—— I wish to avoid an unnecessary consumption of time.

I am not disposed to adopt so broad a principle, as that it is illegal, or improper, to publish in newspapers, *true* reports of cases finally decided by our Courts.— — All are interested in the administration of the Law;— All, are interested in knowing *what* it is, and—all are interested in a knowledge of the manner of its administration.

But to publish even a *true* account of the proceedings of a Court, in any case, while such case is still pending, without the permission of the Court, before which the matter remains undecided, has at all times been holden to be illegal. — The reason is, lest such publication, should injuriously affect the legal rights of one, or the other of the parties.

——By being laid before the whole community, the conflicting claims of individuals—the law—the equity of the matter, become the topicks of general remark; — The opinions, the prejudices, & the passions of the public, become enlisted, on the one side, or on the other; & collateral impulses are given,— & extrinsic causes, which have nothing to do with the merits,—are made to operate upon the final decision.

——It is not *every* Juror, who has clearness enough to see, & firmness enough to resist, the influence of a general & popular sentiment, however unsound, or prematurely conceived:—— It is not every Judge, who can cast off the bias, induced by a desire to render his decisions at all times popular.——Judges & Jurors partake— some more,—some less, but all partake, of the weaknesses of human nature:—— It is better therefore, that no case should be referred, *by anticipation*, to the forum of popular opinion:— and such is the Law.

Nor is it lawful, even after a cause is finally ended, to publish an *untrue*, or an unfair statement of the proceedings in Court relative to it.——

—When the proceedings of Courts of Justice are held up in caricature,—when they are falsified, or made the subjects of scandalous misconstruction, the moral influence of their decisions, is lost;——When that is lost, the laws have lost more than half their obligation:——The result is anarchy;— & out of that grows tyranny. —— Such offences strike then at the foundations of society.

The answers of the Respondent to the Interrogatories filed against him, the affidavit of Mr Ball as well as the publication itself of the 22nd Jan$^y$— place both the publications properly before us:— The latter one indeed is but the republication

of the other with additional matter; —I shall consider them as one matter, & in reference to the general principles I have advanced.

The truth & fairness of an account of Judicial proceedings in a case, must consist, in its *containing all material facts*,— in its *freedom from positive falsehoods*, & in such arrangement of its matter, as to lead to no erroneous conclusions as to its meaning.

Let the statement before us be tried by such a test.—— And first, as to the Juror to whom allusion is made as having been challenged *for cause;*— it not only appeared that the Juror had made up an opinion concerning the guilt of the prisoner, & had publically expressed it, but that at the very moment of his interrogation, in open Court, he re-asserted & avowed *the same* hostile opinion;— This gave additional strength & colour to the objection.— The respondent has not stated that it was upon *subsequent* interrogation, that he avowed the grounds of his opinion;—& he has omitted altogether, the remarks that were made by the Court, touching the impropriety of referring *to the Juror himself*, to decide, how far *he* was capable, (his preconceived opinions of the guilt of the prisoner notwithstanding,) to do justice in the case?——As if that bias which the law presumes might affect his virdict, would not also affect his answer to the interrogation!

(2)—Secondly— The Respondent alleges that the majority of the Court, in giving their opinion, in favour of a New–trial, pronounced affirmatively, that the verdict against Reed, was *a just virdict*. —This allegation is *positively false*.—— The Court did *not compare* the evidence with the virdict;— they did *not* therefore, & could not pass definitively upon its justice.

(3) The Respondent represents the same majority of the Court to have expressed their satisfaction with the "fairness of the trial". —— This allegation, taken *unqualifiedly*, is also untrue. —— So far as regarded the charge of the Judge, (when he committed the case to the Jury, concerning the principles of law, involved in the matter, *they* were to pass upon, which charge was specifically excepted to, by the prisoner;) we deemed it *fair* & *impartial*; ——as a clear & happy exposition of the law in this regard, it met with our *unqualified* assent. —— But whatsoever, in other particulars, may, *hypothetically*, have been supposed, as to the fairness, or unfairness of the trial, it was, in one particular, emphatically objected to; — that is, as to the composition of the Jury.

(4) —Again— The Respondent has averred, that it *did not* appear, that any Juror was objected against except, only, the one he alludes to:—— This allegation also, is directly against the fact. ——The number of challenges made by the prisoner in the case; restricted, & narrowed down, as the rule had been, was very unusually large;— insomuch that, altho' a considerable portion of those challenges were overruled, & the prisoner compelled to submit his case to Jurors, against whom he had in vain urged objections, yet the regular panel was soon exhausted,— & nearly one half the Jury which finally tried the cause consisted of Talesmen, —at different times brought forward to compleat the number required. —— Thus, a prominent feature in the case, was not merely *omitted*— but *flatly denied!* ——Again the Respondent has omitted to state, that the challenge, the overruling of which, is now admitted by the whole Court to have been illegal, was made & overruled, before *any one Juror* had been sworn in chief. —— The *materiality* of such a fact, you, (the Respondent,) are probably unable to comprehend— I will endeavour briefly to enable you to see it.—— First, I will observe to you, that when a Court, especially after argument of Counsel, has deliberately decided a point of law in any case, it is deemed an offence against good manners, for the same

Counsel, afterwards, in the same case, to bring into question, & to argue again, the same matter; — unless indeed he be invited by the Court to do so. —— If a member of this bar, were to persist in such a course, it would subject him to be proceeded against, precisely as you are now proceeded against—— But if Counsel think the decision erroneous,—(& one decision is enough to try the principle;) — the law has pointed out modes in which it may be reviewed & corrected—— Such a mode was pursued, successfully, in the case of Reed.

If then the erroneous doctrine, established in that case, *must have prevailed*, in the subsequent proceedings of that trial —— & if it were proclaimed, before any one Juror was sworn in chief, it must have had the effect to give *character* to the *whole of that Jury which tried the case:* —— i.e. Every Juror, *for aught can be known to the contrary*, — who was sworn & empannelled on that Jury, may, previously have formed & expressed an opinion, that the prisoner was guilty; — & may have gone into the Jury box, with the fullest belief, that his opinion was correct:—— Whereas, if the erroneous doctrine alluded to, had not been announced by the Court, until all but the last Juror had been sworn, the decision could not have had so extensive an influence. —— Why the omitted fact may be thought material, may thus appear—

(5) — Again you have put it into the mouth of the same majority of the Court to say, that they "could not undertake to conjecture" —— in what way the deprivation of the prisoner's "fixed right,"— could have been of injury to him.—— This allegation is likewise, positively untrue. —— No inconsiderable portion of the remarks made, in support of the decision awarding the new trial,—(but which you have thought proper to omit,) ——consisted of illustrations of the proposition, that the prisoner *had* sustained positive injury: ——That, for example, of being compelled to *divert* his two peremptory challenges, *from the purposes, for which they were given* him by the statute; — but especially, that injury, of being forced to a trial, by what, *for aught appeared*, was a *partial Jury;* — a Jury, consisting of men, who may, *each* of them, (for his right of *testing* them, was, by the doctrine established in the beginning, taken away from him;) —— have been influenced by opinions, *antecedently formed:* —— and further, that the non-user of the last of his two peremptory challenges, could not be considered, as rebutting that just & legal inference: — for that so many of the numerous challenges made by the prisoner, had been sustained, (tho' many had been overruled;) —— that the panel was soon exhausted,— & the sheriff tardily bringing in his Talesmen, — whose very names the prisoner could not be apprised of, except at the moment they were severally called up to be sworn; —— Knowing how much the subject had enlisted the passions of people; — & feeling the full force of the decision of the Court, as it regarded the *essential qualities* of the Jury which was to try him, — it would have been unsafe, it would have been indiscretion amounting almost to madness in him, ·to have applied his *last* peremptory challenge, in any, except a case of the last necessity; ——to have cast, prodigally away, his only remaining defence against the danger of having upon that Jury, some one, more fixed, ——more hostile & more obstinate in his opinions, than all the rest! —— He reserved then his right, as safety enjoined, until the last Juror came;— but the last appeared free from exception; — & then, it was too late to use it, in regard to others, for they had already been sworn! ——All these ideas were adverted to, but you have suppressed them.

——It is true, the proposition was advanced, that it was *enough* to know, that the prisoner had ·been, in this matter deprived of his positive & fixed right; ——

But you have not thought proper to advert to what I further said on that point:— It was, that the law, in *such* a case, *implied* an injury;— as it does in other cases where individual right is invaded. ——That *you* happened to be incapable of comprehending such a proposition, can have given you no right, if you undertook to publish a *history* of the matter, to omit it. —— But I will endeavour to explain the principle;—— You, for example have a right to the protection which your house gives you —— This right is invaded by an officer who has civil process to serve;— He forces your outer door & arrests you;—— Is *actual injury* committed? —— Not a nail,— or a screw of your door is disturbed, or left out of place; — The *process* is legal— the debt is just; ——No property is wasted or destroyed,— & substancial justice is done! —— But what says the Law? ——The service of the writ upon you is void, & shall be set aside — for the officer has *invaded your legal right;* & nothing *valid* in the law, shall be grafted, by the plaintiff upon such illegal act!—— But the law does not stop here——it *presumes* an actual damage,— & if you sue for them, damages in money *must be awarded* to you;— there is no alternative,— the Jury will be bound by the law, & by their oaths to award them to you. —— Again, —— if you be sued for a debt,— or indicted for a crime, the law secures to you the *right*, that no testimony shall be heard against you, except in open Court: —— Witnesses accordingly *do testify* in open Court:—— but the Jury in their retirement, wish to hear one of them again;— they send for him to their room — he there repeats, word for word, what he had *before* said, & no more:—— Virdict against you is returned; — it is a *just* virdict — substancial justice is done,— the trial was, in all things else, fair! —— Think you that such a verdict will prevail? —— No — for your *legal right* is invaded—the law *presumes* an injury;— & it is the interest of all, that each, should be protected in his legal right in such cases—the soundest policy demands it. ——And in reference to this course of thought, I further said, in expressing my opinion on the motion of Reed for a New trial, that, for myself, I could not,— nay, dared not, sanction a principle by which a Court *might* deprive a prisoner upon trial, of an undoubted right, one, especially that involved all that there was valuable in jury trial, & then take upon itself to define the quantum of *actual* injury done,— or, at its unbridled pleasure to say, that none whatever, had been suffered!

On the whole, your statement is garbled— it exhibits all the essential qualities of falsehood & unfairness; — it suppresses important facts,——it contains allegations positively false;— & the truths contained in it, are *so* put together, as to lead to *unfair* & erroneous conclusions.

——Thus, if it had related to a matter, no longer pending— but finally detirmined, its author, & all concerned in it, would still have been punishable by the laws of the land.

But it does *not* relate to a matter then, or even now at an end:—— The case of the United States vs Reed is still pending. ——This case, as appears of record, is still to be passed upon by a Jury of his Country: —— It is still to be detirmined whether he is guilty of the aggravated offence with which he is charged; & *the Judges of this Court, have yet to sit in judgment upon him.*

Your recent examination into the books has probably by this time taught you to know, that the most sinful wretch, that walks the street, is, of right intitled, if he be indicted for a crime, to a fair trial,— & by a Jury free from bias — prejudice — & partiality. —— *You* have endeavoured to deprive Reed of *such* a trial — & of *such* a Jury;— for such are the tendencies of your idle & foolish publications. —— You have in the first place announced that he has already been tried by the oaths

of a Jury, & found *guilty:* — this, is true; — but it was highly improper in you, industriously to spread the knowledge of that fact. —— "A new trial, is a rehearing of the cause, by another Jury, with as little prejudice to either party, as if it had never been heard before."

Your reflections have not led you to consider — nor is your knowledge of the human character sufficient, perhaps, to enable you to judge, how difficult it is, for twelve honest men, sworn to decide a case justly, to free themselves from the influence, *of a knowledge of the fact, that twelve other men,* as upright perhaps, & as honest as themselves, have previously, upon their oaths, decided the case, in a particular way. —— Such an influence, will nevertheless steal its way into the minds of the most upright men;— At the *second* trial, therefore, not even an allusion, if it can be avoided, is suffered to be made, as to what transpired at the first; —— & it is the duty of the Court, so far as practicable, to counteract all influence arising from the previous verdict: —— But, should the fact, be drawn to the knowledge of the Jury, —a recollection that a New-trial has been awarded by the Court, has great effect in counteracting such influence. —— The moral effect of a decision of a Court, is still great in Society;— We have not yet reached that awful state of things, when the decisions of our Courts, are no longer regarded with respect. —— The awarding of a New-trial then, (which implies something wrong in the *first* one,) in general serves the purpose of a counterpoise, against the previous virdict: —— But in your publication, you have falsely alleged, that the Court had said they were satisfied, that the first verdict was a *just one.* —— If you are to be believed then, a Jury of twelve men, upon their oaths, & the Judges also of the Supreme Court: — three men appointed by the highest authorities in the Nation, for their presumed integrity— & capacity— & fitness for the discharge of the high duties devolved upon them, have all—upon their oaths pronounced, that John Reed is guilty of the heavy charges brought against him, & ought to be punished! —— What can have a more decided tendency to jeopardize the claims of justice, than such a publication? ——What can more manifestly tend to produce prejudice, & bias— & thus poison its streams?

There *were* circumstances, connected with the case of Reed, *peculiarly* calculated to inlist the feelings, & excite the angry passions of people; *peculiar* caution therefore, was called for: ——But—suddenly, the case is wrested from the hands of the proper administrators of justice, & thrown garbled— & lampooned, before the public!— What a time then was this, for *calm* investigation? — What a time for the unimpassioned adjustment of the conflicting rights of the public, & of an individual indicted for an enormous crime? — & by a jury too,—strait from the reading perhaps of *your* intemperate comments; & warmed possibly, into a feeling of high indignation by a *false* account of supposed wrongs & absurdities committed in our Courts of Justice!

The prisoner therefore complained, as he had a right to do, of your interference. He made affidavit that your scandalous publication, was calculated, unduly to influence his trial. He accompanied his affidavit by one of your newspapers, containing the obnoxious publication, & made that, *one* principal ground of his application for a postponement of his trial until another Term. —— Other reasons were indeed urged by him,— but if there had been no other,— &, humiliating as the consequence *might* be, thus to delay the purposes of Justice, by reason of your impertinent interference, yet, if there had been no other cause, his trial would probably have been postponed: —— Justice to the prisoner — & respect for his legal rights, at least in *my* opinion, would have required it.

—— Your answers to the Interrogatories filed against you, admit your responsibility for both publications alike—— I consider them as *one* matter; & deem them censurable, first, because they relate to a cause pending in Court, & undecided;—or, I should rather say to two destinct matters; for the republication by you of the first offensive article, in apparent defiance of this Court, was during the pendency of the proceedings against your Printer; — Second — Because they contain a mischievous & false account of proceedings done here;— & Thirdly, because they tended injuriously to affect the right of Reed, to a fair & impartial trial.

But there remains another aspect in which they must be considered;—— I mean in reference to the scandalous aspersions they cast upon the Court itself. —— On such a topick, I have no disposition to dwell.—— There is an effort at sneering—a cynical display of ill humour & sarcasm, pervading both publications, fitly enough illustrated in their very caption. —— It is manifest, that the writer intends that his readers, & the whole public shall believe, that the Judges of the Supreme Court, are not qualified for the offices to which they were appointed by the President & Senate of the United States— that heretofore, as well as during the present term, they have accomplished but little business; & that little, badly;—— that they have neither the firmness, nor the talent,— nor the learning necessary, to capacitate them to administer the laws of the Country, as they ought to be administered,—— that they are, both ignorant & arrogant, & yet are too timid, to inflict punishment upon you for your bold aspersions!

The decisions, & all the proceedings of this Court, are of record: —— They there exhibit true & imperishable evidence of the quantity of business done by the Court, & of the manner of doing it; — of the degree of skill therefore, & capacity possessed by this Court, or of its ignorance, incapacity & arrogance.

Upon *this* basis, our reputation must rest: ——By this test we expect,—we wish to be judged. ——If our decisions be legal & just, we shall receive the highest reward which can be conferred by men,— the approbation of this & future time: —If our decisions exhibit ignorance of our duties—arrogance, or any unfitness, obloquy & shame will meet us!

But while we submit with cheerfulness to an ordeal, which we could not, if we would, avoid, we have the consolation to know, that we shall be bound by the decision of those only, who are capable of judging, ——In that decision, neither boyish vanity— nor empty declamation— nor impertinent ignorance, will have a voice;— with *that* decision, *you*—will have nothing to do! —— You—were never appointed arbiter in matters of this sort, that you, should obtrude an opinion; —— You,—are not the people,— the whole body of the people, as your speech implies, that you should call us to an account for our decisions—— You, have never been made Dictator, in matters of law,— or of decorum;—— & none ever entertained a thought so wild,——as that of placing you, within the portals of the Temple of Science! —— Even of this effort at scandalous pasquinade, altho' you have been willing to add to its offensiveness, you are manifestly incapable —— You have confessed that you have had other aid: —— And we cannot avoid the suspicion, painful as the reflection may be, that your anonymous correspondent, is some vain — some recreant member of the bar! —— Who, he may be, we have no judicial, or other knowledge: ——We do not feel disposed to exercise, further than our duty may compell us, any inquisitorial power to obtain that knowledge; —— for if we were possessed of it, public justice— self respect— respect for the laws of the land, would impose upon us a duty, so painful, that, if practicable, we could wish to avoid it. —— But thus much further on that point, I think proper now to say;

—— that if your anonymous correspondent be indeed of the profession of the law, *he* has *yet* to learn, that *modesty*, forms as essential an ingredient in the character of an *accomplished* Lawyer, as it is ornamental in social intercourse, & necessary to the preservation of the harmonies of life; —— *He* has *yet* to learn, how broad the destinction is, between *inflated pedantry*, & sound & expanded legal learning: — *He* has *yet* to learn, that there is neither wit nor wisdom in his attempt to bring into disgrace, the administration of the law,—— for that, in whatsoever proportion, he may succeed in such a struggle in that same proportion, will his own individual claims to respectability, as a member of the profession, be lessened by his suicidal efforts!

——But whatsoever may be *his* demerits, *your* excessive folly, in intermeddling in such matters, is not the less conspicuous. —— Some beings there are, whose passion for noteriety is so great, that they are found, purposely pressing into mischief,— that when they shall have paid the courted forfeit of their folly, they may then, loudly claim the rewards of martyrdom! —— If such were *your* incentive, you will have leizure, as you become more conversant with the world, to reflect how far, the course consisted with common sense, & the duties you owe to society.

As for the law of the case,—— it is clear: It has been settled doctrine, & from the earliest times, that the proceedings of Courts, shall not be the subject of *scandalous reproach:* — That it is the *duty* of those, who are appointed Judges, by the constituted authorities of the land, to protect their own judicial acts from scandalous aspersions, & their judicial characters from all abusive reflections. —— To the reasons on which this law is founded, I have not been, perhaps an easy convert —— I have been led, heretofore to beleive, that purity of motive, & correctness of conduct, would always constitute a sufficient shield against the shafts of calumny; —— I have been led to suppose, that with a generous & intelligent community, the odium, & the contempt by which the common slanderer is always followed, would furnish a sufficient antidote, against the poison of his detraction. —— But however just such notions may be in private life, Statesmen & Judges—wise & learned men, have not considered them, applicable to Courts of Justice;—nor to those who are appointed to administer the law. —— Strong reasons exist why they should not. —— No man *loves* to have his actions traduced,— nor to have the filth of scandal thrown at him, in his march thro' life: —— A Judge then, *might* be tempted to swerve, in his decisions, from the path of truth, by the *fear* of such a consequence.

If all such as administer the Law, were, with impunity to be made targets,— for the envious & the common slanderer to cast their wicked shafts at,—— if they are to be holden up in caricature, as fit objects of ridicule or indignation;— if their motives are to be impugned, & their decisions misrepresented & vilified, —— Would high & honourable minds,—— would those who value reputation,— would wise & learned men, & those *most fit*, to administer the law, be found willing to enter upon such a scene of moral pollution as our Courts, would then exhibit?

—— But a greater evil still, would ensue; If the character of an individual manager of a public newspaper, be contemptible, & his *single* attack be correspondingly innoxious, yet, who can estimate the effect, among the multitude of his readers, of his repeated,— his varied— his unceasing efforts, to cast ridicule & odium, upon the Courts, & their Judges? —— Public confidence in the administration of the law, would certainly be lessened,— if not destroyed;— & the law itself fall into disrepute!

But upon whatsoever reasons the law may be founded, such certainly *is* the

law— not merely of G. Britain, but of our own Country—— It is made ours by grant & by adoption— the Ordinance of 1787 has made it ours— But the Supreme Court of the United States has affirmed the whole doctrine of the Law concerning contempts of Court, & I venture to say, that every respectable Court of every State in the Union, especially where the Commonlaw prevails, has so affirmed it

The grave question then presents itself to this Court, shall the *Law* bend to the Editor of the Detroit Gazette,——or shall that Editor bend to the Law?

But,— to carry into effect the Law, we were appointed;— To carry into effect the Law, we were sworn! — To carry into effect the Law, we are bound, by every motive, which can be founded in a just regard to our own characters——& in a just regard to the duties we owe to Society & to God! —— We *may* not then,—— We *must* not hesitate in our course.

Some there are, it would seem, who think this Court has the *legal* right to proceed, as it has proceeded,—— & that your publications are, in this way, obnoxious to punishment;— but who nevertheless say, that it is *inexpedient,* so to proceed: — Inexpedient? —— It is *always* expedient for the Court to do its duty! —— For *one,* *I* could descend from the place, I occupy here, —— *I* could leave *my* seat, on this Bench, without *One* feeling of regret: ——It is a place I never sought for; —— I asked no one's favour for it;— I solicited no man's vote or influence, in order to obtain it: —— But *while I occupy it,* I cannot consent to disgrace it! —— No idle threat, therefore, of Newspaper vengeance — No sickly & unprincipled timidity, on my part, shall induce me to shrink from the performance of my duty! —— All this, those who know me, know.

You talk of the right of a Jury trial:— This is the very right, you have endeavoured to impair,—— for such was the tendency of your labours:—— But a Jury trial, for what? —— to inform this Court what appears of record? — to inform the Court, of what they themselves, have done, or said? —— to inform the Court the meaning of language— & that the Law may punish contempts? ——

—— Suppose a witness refuse to obey the process of the Court; must a Jury be empannelled to ascertain the fact? —— Suppose a hissing & a shouting on this floor, in the midst of a trial? —— suppose violence committed to an officer of this Court —— or a Judge upon this Bench;— Is there no check——must the Law be suspended, & all things wait, until the annual return in this place of a Grand Jury, before punishment can be inflicted? —— But the Juror himself does not come;— what then—? Shall the Sheriff be sent for him?— But the Sheriff may not go— & why should he— if the Court have no power to coerce him? — So, absurdities would follow upon the heels of each other! —— Your legal advisers seem to have been aware of this dilemma, & you have been induced to admit, no doubt upon full consideration, & consultation too, that in *such* cases, the Court *must* be admitted to have the power to proceed summarily & punish:—— Well, but do you not perceive, that this admission concedes the *whole principle?* —— What comes then of your constitutional inhibition? —— The Court may proceed without a Grand Jury— & punish without a petit Jury, in the cases you ennumerate:—— But where will you draw the line of destinction? —— By a high reward, you may persuade the Sheriff to *pack* a Jury —— By threats, or seductive promises, you may induce an important witness against you, to secrete himself, that he may not appear in Court:— these, & a hundred others which may be supposed, do not come within *your* specifications, & yet they impair the fair administration of Justice.

——You have adverted to the act of Congress, purporting, you say in certain cases, to give the Courts of the United States power, to punish summarily for

contempts:—— But are you ignorant of the proposition, that an act of Congress even, if contrary to the constitution is void?— The truth is, that the constitutional provision you allude to, applies only to that class of cases, which are *properly* the subject of Jury trial — & to none others.

Suppose a decree of a Court of chancery were disobeyed——how is the contumacy to be punished & the decree to be enforced, but by attachment as for a contempt? —— Suppose an award made, in pursuance of a Rule of Court— or any other Rule of Court legally entered into, to be disobeyed? —— The offence would be a contempt, & as such, summarily punished;— for obedience to such rules, concerns the administration of Justice. —— In short, whatsoever interrupts the progress of Justice,—— whatsoever perverts, or endangers the regular administration of the law; threatens, or casts scandalous reflections upon those who administer it, touching the execution of their office, is *in contempt of the authority of Court*, & *must*, from the nature of things, be proceeded in, summarily—— In that aspect, & *as contempts*, they never were the subjects of Jury trial, & were never within the scope nor the intention of the constitutional provision alluded to. The power to proceed summarily in such cases, is inherent in the Court, from its very establishment. In the language of the Supreme Court, in the case of the U. States vs Hudson & Goodwin, "to fine for contempts — imprison for contumacy &c— are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others:——And so far, our Courts, no doubt possess powers, not immediately derived from Statute."

You talk too, about the liberty of the press! No one here, has a thought of invading it:— the *question* is, as to its abuse! —— You have the liberty also of bearing arms, secured in like manner, by constitutional provision. —But have you therefore the right to use them for the purposes of Murder? —— You have the right to carry a lighted torch;— Have you therefore the right to set your neighbour's House on fire? —— Is your right to use your types, more excellent—more sacred, than your neighbour's right to his well earned reputation?

—— Use your right therefore — but use, without abusing it—— Does the Constitution—or does Judge Tucker whose dissertation you have read, vindicate the abuse of it?—— Use your right — but do not invade the rights of others.—— Use your types, but you must beware how you attempt to pervert & blacken with them, the proceedings of the constituted Courts of your Country!

——What then shall be further said in your behalf? —— Shall your ignorance secure you?—— Ignorance of the law *justifies* no man:— In *your* case, it cannot even excuse;— for if you had consulted the dictates of morality & common decency, you would have avoided the difficulty you are in.

Ignorance, coupled with modesty & good intention would certainly intitle itself to every charitable regard—— But ignorance such as yours, & associated with pretensions, so sublimated, & so mischievous, can furnish no just ground of claim.

"For ten years past," you say, you "have pursued in your newspaper, the business of "calling the people's servants to account; ——that you commenced & pursued a system of attack against those who occupied the seats *we* now occupy: —— That in all that time, you never were proceeded against for contempt! —— never indicted as a Libeller — never sued by them in a civil action for slander — & that no notice whatever, was taken by them of your charges!

And can you *really* suppose, that the Judges of this Court, have nothing better to do, — no higher duty to perform, than to vindicate their claims to respectability, & sustain the correctness of their judicial decisions, in *your newspaper?*

——To sustain himself in this community, is it *indeed* your opinion, that every officer of the Government, must first have served an apprenticeship in Grub-street, that he may meet you on equal terms? —— But, you further, exultingly remark that in consequence of our predecessors' taking no notice of your charges, the people *believed them to be true;* & consequently deprived them of their offices, & that you "drove them or the most of them, from the Territory"!

By indulging in such remarks, you have suffered your vanity, to get the better of judgment: — you might better have kept yourself, within your written speech, —— manifestly as even that, discloses, features of defiance & encreased contumely!

In fine;——if we look at the law of the case, it is clear; ——if we look at the two publications,—they breath the spirit of contempt & defiance! —— if we look at your answers to the interrogatories,— we see a proud avowal, that they are the joint product of *your* fabrication & procurement! —— if we look at your deliberately prepared & written speech,— we find matter of aggravation, rather than of defence!

But, you have not invoked the charitable consideration of this Court, in vain:—— we *suppose* this to have been the first, we hope it will also be the last, instance of the kind in this Territory: —— As it *is* the first instance, —— as the Law in the matter, seems to have been imperfectly understood here in times past, — we are *therefore* induced to lessen the punishment now to be inflicted: —— We have had repeated & repeated occasion to delay progress in this case, upon *your application*, by reason of your ill health & feeble constitution— We are *therefore* disposed to lessen it—— We recognize in you a husband, & a father of children, who might be exposed to suffer, by reason of your imprisonment—we are *therefore* disposed to lessen it. —— We *know our duty*, & have shown that we are detirmined to perform it;— We know our power too, but we know that it best becomes us to use it with great moderation.

Upon the fullest & the most unimpassioned consideration of the case therefore, we have unanimously detirmined to sentence you — & you are accordingly sentenced to pay a fine to the United States of One hundred dollars & the costs of prosecution,— & that you stand committed until the sentence be complied with.